Oak Grove Techs., LLC v. Seventh Dimension, LLC, 2025 NCBC 50.

STATE OF NORTH CAROLINA

DAVIE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CVS000311-290

OAK GROVE TECHNOLOGIES, LLC,

       Plaintiff,

v.

SEVENTH DIMENSION, LLC and JASON CLARK,

       Defendants and Third-Party Plaintiffs,

v.

MARK GROSS, RICHARD HAGGERTY, MATTHEW FARR, and MICHAEL SMITH,

       Third-Party Defendants.

**ORDER AND OPINION ON MOTION TO DISMISS AMENDED COUNTERCLAIMS AND THIRD-PARTY COMPLAINT**

1. This matter is before the Court on Plaintiff's and Third-Party Defendants' motion to dismiss Defendants' amended counterclaims and third-party complaint. (ECF No. 35).

2. Having considered the amended counterclaims and third-party complaint (collectively, the "Counterclaims"), the written and oral arguments of counsel, and other relevant matters, the Court hereby **GRANTS in part** and **DENIES in part** the motion for the reasons set forth below.

*Kilpatrick Townsend & Stockton LLP, by Dustin Greene, Chelsea Simon, Kyleigh Feehs, and Elizabeth Winters, for Plaintiff Oak Grove Technologies, LLC and Third-Party Defendants Mark Gross, Richard Haggerty, Matthew Farr, and Michael Smith.*

*Morningstar Law Group, by J. Christopher Jackson and Kenzie Rakes, for Defendants Seventh Dimension, LLC and Jason Clark.*

Houston, Judge.

## I.  BACKGROUND[1]

3.  The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss for failure to state a claim. Instead, for background, the Court summarizes the complaint's factual allegations that are most relevant to the Court's decision.

4.  Defendant Seventh Dimension, LLC ("7D") and plaintiff Oak Grove Technologies, LLC ("OGT") are both defense contractors that provide personnel, training, and other services to the United States Department of Defense. (Am. Countercls. ¶¶ 14, 16, ECF No. 33).

5.  Defendant Jason Clark owns and is the president of 7D. (Am. Countercls. ¶¶ 2, 33).

6.  Third-party defendant Mark Gross is OGT's former CEO and the current chairman of its board of directors, and third-party defendants Richard Haggerty, Matthew Farr, and Michael Smith are officers of OGT. (Am. Countercls. ¶¶ 4–7).

7.  For a number of years, OGT served as a prime contractor for the U.S. Army Special Operations Command ("USASOC") under a contract known as the Army

---

[1] Though most of the Counterclaims are raised on behalf of 7D only, the allegations are pleaded by Defendants jointly. The Court references them accordingly, even where a particular claim is asserted only on behalf of 7D.

Special Operations Forces Training Support Contract (the "ARSOF Contract"). (Am. Countercls. ¶¶ 20, 25).

8. In 2019, USASOC rebid the ARSOF Contract. Due to a change in USASOC's contracting requirements, OGT was no longer eligible to serve as the prime contractor, so it teamed with 7D to bid on the work, with 7D to serve as the prime contractor. After a protracted bid protest and related litigation, in November 2022, USASOC eventually awarded 7D the position of prime contractor under a new ARSOF Contract, which provided for one base year of performance and four option years. (Am. Countercls. ¶¶ 21–26).

9. Consistent with the companies' plan, OGT and 7D executed a subcontract in November 2022 (the "ARSOF Subcontract"), pursuant to which OGT served (and continues to serve) as a subcontractor for 7D. In the ARSOF Subcontract, the parties initially agreed that 7D would "perform work corresponding to not less than 51% of the total amounts paid under the ARSOF Contract" and that OGT would "perform work corresponding to not less than 49% of the total amounts paid under the ARSOF Contract," allocated responsibility for different types of personnel to be provided under the ARSOF Contract, and set the rates 7D would pay OGT for the services of different classes of personnel. (Am. Countercls. ¶¶ 28–29).

10. Shortly before 7D and OGT signed the ARSOF Subcontract, Gross, Farr, and Moner Attwa (OGT's then-CFO) met with Clark at OGT's office to discuss the terms of the ARSOF Subcontract. During that conversation, even though 7D itself was the prime contractor under the ARSOF Contract, 7D contends that Attwa—an

officer of OGT and not a party to the ARSOF Contract—misrepresented to 7D's representatives the manner in which the government would ordinarily be expected to place task orders under the ARSOF Contract between the government and 7D. (Am. Countercls. ¶¶ 122–23, 125).

11.   In short, Defendants contend that OGT, through Attwa, misled 7D's representatives about 7D's own relationship and contract with the government. (Am. Countercls. ¶ 31).

12.   According to Defendants, around approximately November 12 to 14, 2022, Attwa (again, an officer of OGT) "told Clark that the Government would issue one task order per year for all of its ARSOF requirements and that 7D could bill the Government in 12 equal monthly installments for all work performed." (Am. Countercls. ¶ 122).

13.   It appears that, in substance, this is at least partially correct. Defendants acknowledge that the government does, in fact, "issue[] its task orders based on a 'Statement of Objectives,' (*i.e.*, annual projections) . . . provided to the Prime Contractor [i.e., 7D] each October/November" and that, in turn, "7D issues task orders to OGT based on these annual projections." (Am. Countercls. ¶¶ 123–24).

14.   However, Defendants assert that, after issuing its annual projections, the government also conducts monthly reconciliation meetings with prime contractors like 7D to confirm fulfillment of the prior month's requirements under the Statement of Objectives and to finalize or adjust the next month's requirements under the Statement of Objectives, if necessary. Thus, the government's needs under its ARSOF

Contract with 7D, and 7D's needs under its ARSOF Subcontract with OGT, might change and be adjusted month-to-month. (Am. Countercls. ¶ 123).

15. Based on OGT's long experience as prime contractor working with the government, Defendants contend that Attwa and OGT's other officers knew or should have known that this would also be the case under 7D's ARSOF Contract with the government but did not mention the government's (a third party's) standard monthly reconciliation process to 7D's representatives. (Am. Countercls. ¶¶ 31, 121).

16. Now, 7D contends that, even though 7D was the party contracting with the government, it did not know about the government's processes and that 7D would not have agreed to the ARSOF Subcontract's terms "concerning the division of work and revenues/profits if OGT had disclosed the existence and importance of the Statement of Objectives and monthly PMO meetings" under 7D's ARSOF Contract with the government, as the interplay of those terms with the government's task order and invoice-related practices makes the ARSOF Subcontract less profitable than 7D expected. (Am. Countercls. ¶¶ 121–26). Defendants do not, however, plead facts suggesting that the government's processes or procedures are not specified in the ARSOF Contract or that it could not have discerned them by conducting commercially reasonable due diligence.

17. After beginning performance under both the ARSOF Contract and ARSOF Subcontract, 7D came to believe that OGT had kept the most profitable work for itself, deceiving 7D into an unfair arrangement through largely unspecified "material misrepresentations and omissions" about labor categories, rates, and historic profit

margins. As a result, 7D complained and sought to amend the ARSOF Subcontract. (Am. Countercls. ¶¶ 31–34).

18.    In November 2023, 7D and OGT amended the ARSOF Subcontract to reduce OGT's workshare obligations with respect to work contemplated by the overall ARSOF Contract. Under the amended agreement, OGT's workshare was reduced to "work corresponding to not less than 46% of the total amounts paid by the [government to 7D] for performance under the" ARSOF Contract, thus setting the workshare and revenues at 54% for 7D and 46% for OGT. (Am. Countercls. ¶¶ 35–36; ARSOF Subcontract Amendment § B.3, ECF No. 72.2).[2]

19.    Not long after, Gross told Clark that "OGT wanted to phase-out its participation" in the ARSOF Subcontract completely, and OGT allegedly offered to terminate the ARSOF Subcontract at the end of the third option year. (Am. Countercls. ¶¶ 39–42). However, OGT allegedly never provided "a promised transition plan for the subcontract." (Am. Countercls. ¶ 133).

20.    Defendants also complain that OGT and Third-Party Defendants repeatedly promised that OGT would be a "good partner" or a "good teammate" but failed to live up to these assertions, which largely post-dated execution of the ARSOF Subcontract. (Am. Countercls. ¶¶ 128, 130, 135, 138).

---

[2] While neither the original ARSOF Subcontract nor the amendment was attached to the Counterclaims, both documents were specifically referenced in the Counterclaims and provided with the opposition briefing. A "court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers" when ruling on a 12(b)(6) motion. *Oberlin Cap., L.P. v. Slavin,* 147 N.C. App. 52, 60 (2001).

21. For now, the parties are still operating under the ARSOF Subcontract, but their relationship has deteriorated, with OGT and 7D trading accusations of wrongdoing. For example, OGT has allegedly provided personnel and contractors who are unfit or lack required security clearances, failed to replace personnel in a timely manner, failed to update personnel rosters, billed 7D improperly, failed to perform its workshare, failed to provide required equipment, and failed to follow contractual dispute resolution procedures. (*See, e.g.*, Am. Countercls. ¶¶ 44, 71.) Moreover, Smith has allegedly gone behind 7D's back to meet with the government contracting officer for the ARSOF Contract, seeking changes favorable to OGT and telling the officer that 7D was struggling to recruit and retain personnel; 7D and OGT compete for government contracts, and Defendants believe that OGT wanted to sour the government's opinion of 7D and thereby improve OGT's chances in future bidding. (Am. Countercls. ¶¶ 96–102, 108). Defendants also allege that Farr defamed Clark in several emails sent to one of 7D's officers, asserting that Farr accused Clark of forgery and fraudulently obtaining the government's signatures, acting in an "extortionate" manner, "scheming," and making various misrepresentations. (Am. Countercls. ¶¶ 148–53).

22. Additional disputes arose in late 2024 and early 2025. In December 2024, the government informed 7D that it would rebid the ARSOF Contract early—rather than maintaining the current ARSOF Contract for all four option years—if 7D did not agree to a 15% reduction in the total amount to be paid. 7D eventually agreed,

and it now contends that it has the right to reduce the rates to be paid to OGT under the ARSOF Subcontract accordingly. OGT disputes this. (Am. Countercls. ¶¶ 51–57).

23. Meanwhile, in January 2025, the government told 7D that it would need fewer workers from 7D in option year two than it had anticipated, and 7D issued revised task orders to OGT to reflect this change. According to 7D, OGT has "wrongfully refused to execute the most recent revised task orders issued by 7D, threatening to disrupt military training exercises," even though OGT has nonetheless continued to provide services under the ARSOF Subcontract. (Am. Countercls. ¶¶ 47–50).

24. The ARSOF Subcontract is not the full scope of the parties' relationship. In 2021, before the government awarded 7D the current ARSOF Contract in 2022, the government awarded 7D an Expeditionary Operation Field Services Contract (the "EOS Contract"), and 7D and OGT entered into a subcontract agreement (the "EOS Subcontract") that resembles in many ways the subsequent ARSOF Subcontract. As with the ARSOF Subcontract, Gross allegedly told Clark in 2023 that OGT wanted to reduce and eventually end its participation in the EOS Subcontract. The EOS Subcontract terminated in December 2023, and Defendants now allege that OGT breached the EOS Subcontract in various ways, including by failing to return government property, failing to provide enough instructors and role players, submitting improper invoices, and providing an employee who behaved inappropriately. (Am. Countercls. ¶¶ 58–67, 80).

25. OGT has its own grievances under the ARSOF and EOS Subcontracts, and it initiated this action by filing a complaint in Davie County Superior Court on 5 June 2024. (ECF No. 2). OGT filed an amended complaint in January 2025, (ECF No. 21), and Defendants filed their Counterclaims on 28 February 2025, (ECF No. 33). Defendants assert purported counterclaims for breach of the ARSOF Subcontract, breach of the EOS Subcontract, declaratory judgment, tortious interference with prospective business relationships, tortious interference with contractual relations, fraud and fraudulent inducement, negligent misrepresentation, defamation, unfair and deceptive trade practices, and punitive damages.

26. On 25 March 2025, OGT and Third-Party Defendants moved to dismiss many of Defendants' Counterclaims, including parts of the claim for breach of the ARSOF Subcontract, all of the claim for breach of the EOS Subcontract, part of the declaratory judgment claim, the entirety of both tortious interference claims, the joint fraud/fraudulent inducement claim, the negligent misrepresentation claim, the Chapter 75 claim, and, except in part, the punitive damages "claim." (ECF No. 35).

27. The motion is fully briefed, and the Court held a hearing on 27 June 2025, which counsel for all parties attended. The motion is ripe for decision.

## II. LEGAL STANDARD

28. In ruling on a motion to dismiss for failure to state a claim, the Court must determine "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v.*

*Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation omitted). Dismissal is appropriate if "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Id.* (citation omitted). The Court must treat the well-pleaded factual allegations as true and view them "in the light most favorable to the non-moving party." *E.g.*, *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (citation omitted).

### III. ANALYSIS

29. OGT and Third-Party Defendants challenge all or parts of nine of Defendants' claims. The Court addresses each claim in turn.

30. **First Claim for Relief—Breach of the ARSOF Subcontract (7D v. OGT)**. To state a claim for breach of contract, a plaintiff need only allege "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000). Here, OGT and Third-Party Defendants do not dispute that 7D has adequately alleged the existence of a contract but contend that it has failed to allege facts demonstrating a breach of the contract.

31. Defendants allege in paragraph 71 of their Counterclaims that OGT breached the ARSOF Subcontract with 7D in various ways, including in the following eleven ways, each of which OGT seeks to have dismissed:

> b. Providing personnel and contractors without proper security clearances, proof of insurance, and/or proof of physical (*e.g.*, violation of Sections B.2, C.1, G.7, PWS 1.6.9, 1.6.17.4, 1.6.17.6);
>
> . . .

d. Failing to inform 7D when OGT personnel and contractors left the engagement and/or were substituted or to update related personnel rosters (*e.g.*, violation of Sections B.2, C.1, G.3, PWS 1.6.12, 1.6.13, 1.6.22, DD254);

. . .

f. Providing personnel that the Government required 7D to remove because of lack of a valid security clearance (*e.g.*, violation of Sections B.2, C.1, PWS 1.6.14.1);

g. Providing employees unfit for service; in at least one instance an OGT employee/contractor was found drunk on the job and had to be removed from a Government facility (*e.g.*, violation of Sections G.7, G.11);

h. Improper billing including based on the provision of unqualified or non-credentialed personnel (*e.g.*, violation of Section B.6);

. . .

k. Failing to complete replacement of required contractors within 10 days pursuant to the agreement (*e.g.*, violation of Section B.3.1), *See* Exhibit 21, October 16, 2024 Email from J. Clark;

l. Failing to provide 46% of the workshare (*i.e.*, actual work performed) under the agreement (*e.g.*, violation of Sections B.3, B.3.1, B.3.2);

m. Failing to provide required equipment (*e.g.,* vans) for use by 7D personnel under the ARSOF Subcontract (*e.g.*, violation of Section B.2, C.1, PWS 1.1, 4.1);

. . .

p. Refusing to sign amended task orders based upon new Government requirements (*e.g.*, violation of Sections B.2, B.5) . . .;

q. Refusing to follow the procedures in Section H regarding dispute resolution; and

r. In other ways to be proven through discovery and at trial.

(Am. Countercls. ¶ 71).

32. The movants argue that the plain language of the ARSOF Subcontract defeats Defendants' claims of breach in subparagraphs 71(g), (k), (p), and (q).

33.    Subparagraph 71(g). As to subparagraph 71(g), Defendants allege that OGT violated sections G.7 and G.11 of the ARSOF Subcontract by providing unfit employees, including one who "was found drunk on the job and had to be removed from a Government facility." (Am. Countercls. ¶ 71(g)).

34.    Section G.7 of the ARSOF Subcontract requires OGT to "instruct and cause its personnel to comply with applicable Department of Defense (DoD) rules, policies, procedures, and standards of conduct per the policies listed in Exhibit B – Base Performance Work Statement" and to "promptly address the issue of compliance" and permanently remove the employee at issue if notified and requested in writing to do so. (ARSOF Subcontract § G.7, ECF No. 72.1).

35.    As Defendants point out, the Performance Work Statement (the "PWS") attached to the ARSOF Subcontract provides that the "Contractor shall ensure [its] personnel do not perform work under the influence of alcohol, illegal prescribed drugs or any other incapacitating agents." (ARSOF Subcontract, PWS § 1.6.22.6).

36.    Meanwhile, G.11 passively provides that "[n]otification of whether an employee of [OGT] involved in a serious incident in connection with this Subcontract will be reassigned to duties will be provided to [7D's] Contracts Manager." G.11 also grants 7D the right to instruct OGT "to indefinitely remove said employee from performing under this Subcontract." (ARSOF Subcontract § G.11). Between the Counterclaims and their exhibits, including an incorporated letter dated 8 June 2023, Defendants contend that OGT never provided notice of the incident with the drunken

worker or notice as to whether the employee was being replaced. (Am. Countercls. ¶ 73; Notice of 8 June 2023, ECF No. 33.25).

37. Construing the allegations in the light most favorable to the non-movants, Defendants have alleged that at least one of OGT's personnel "was found drunk on the job," that 7D was not notified of the incident, and that OGT failed to confirm whether the worker would be reassigned. Accepted as true, these allegations sufficiently allege a breach of the ARSOF Subcontract, and the motion to dismiss will be **DENIED** as to this claim.

38. Subparagraph 71(k). Next, in subparagraph 71(k), Defendants contend that OGT violated section B.3.1 of the ARSOF Subcontract by "[f]ailing to complete replacement of required contractors within 10 days." (Am. Countercls. ¶ 71(k)). OGT argues that it could not have breached the contract on this basis because section B.3.1 requires only *identification* of a replacement worker, not completion of the replacement process. OGT is correct.

39. "Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court may not ignore or delete any of its provisions . . . ." *State v. Philip Morris USA, Inc.*, 193 N.C. App. 1, 12–13 (2008) (citation omitted).

40. Here, the ARSOF Subcontract requires OGT to provide, consistent with the PWS, all personnel, services, and materials that 7D requests in its task orders. (*See, e.g.*, ARSOF Subcontract § C.1). Section B.3.1, however, provides in relevant part as follows:

> Prime Contractor reserves the right to perform these services with their own personnel in the event Subcontractor is unable to fulfill the Task Order requirements, Subcontractor shall be given reasonable notice and shall have ten (10) working days to *identify* a replacement candidate.

(ARSOF Subcontract § B.3.1 (emphasis added)).

41. Though the ARSOF Subcontract is not a model of clarity on the whole, the plain language of B.3.1 is unambiguous, particularly when read in context. Once reasonable notice is provided to OGT, OGT is not required to complete every step necessary to replace one of its workers. Rather, OGT has ten working days to "identify" a replacement candidate.

42. Defendants do not allege that OGT failed to identify a replacement worker within ten working days after notification. At most, Defendants allege that the requisite notice was provided and that OGT identified a replacement within ten working days, but that OGT had the replacement worker start work shortly after, outside the ten-working-day window. (*See* Am. Countercls. Ex. 21, ECF No. 33.22).

43. Even accepted as true, Defendants' allegations do not rise to the level of a breach of the ARSOF Subcontract, and the motion to dismiss will therefore be **GRANTED** as to this claim.

44. Subparagraph 71(p). Defendants further allege that OGT violated sections B.2 and B.5 of the ARSOF Subcontract by "[r]efusing to sign amended task orders based upon new Government requirements." (Am. Countercls. ¶ 71(p)).

45. Section B.2 provides that 7D has "the authority to make a final decision on Task Orders, subject to the workshare allocation set forth in Section B.3." Meanwhile,

B.5 provides that "[n]o reimburseable [sic] Subcontractor work shall commence before receiving a completed and signed subcontract task order from Seventh Dimension." (ARSOF Subcontract §§ B.2, B.5).

46. Neither provision cited by Defendants requires *OGT* (rather than 7D) to sign task orders, whether in light of "new Government requirements," prior to beginning work, or otherwise. Rather, OGT must comply with properly issued task orders signed and submitted by *7D*.

47. As above, accepting the allegations as true, the plain language of the ARSOF Subcontract demonstrates that the facts pleaded do not constitute a breach of contract. Accordingly, the motion to dismiss will be **GRANTED** as to this claim.

48. Subparagraph 71(q). The movants next seek to dismiss the portion of 7D's claim premised upon Defendants' allegation that OGT breached the ARSOF Subcontract by "[r]efusing to follow the procedures in Section H regarding dispute resolution." (Am. Countercls. ¶ 71(q)).

49. Section H.2 of the ARSOF Subcontract permits 7D's contract manager to request certain changes regarding performance under the Subcontract, including changes in

> (i) drawings, designs and specifications, to include technical requirements and descriptions included in the statement of work, (ii) reasonable adjustments in quantities and/or delivery schedules, (iii) place of delivery, inspection or acceptance, (iv) shipment or packing methods, (v) amount of [7D]-furnished property; and, if this Contract includes services, (vi) description of services, place, and/or time of performance of the services, within the general scope of this Contract.

(ARSOF Subcontract § H.2).

50. If a change would modify the cost of or time required for performance, OGT "must assert any claim [regarding the change] in writing . . . within twenty-four (24) days after [OGT's] receipt of such a requested change," after which the parties are obligated to engage in negotiations towards an "equitable adjustment" to address the change. (ARSOF Subcontract § H.2). If the parties are unable to reach an agreement, this qualifies as a "dispute" under section H.7 of the ARSOF Subcontract, which permits either party to sue in a court in North Carolina when "a dispute arises between [them] pertaining to the subject matter of this Subcontract." (ARSOF Subcontract §§ H.2, H.7).

51. Taken together, sections H.2 and H.7 require OGT to present certain claims to 7D before asserting them in court to permit the parties to negotiate outside of court, and those claims qualify as bona fide "disputes" only after (i) OGT follows the procedure set out in H.2 and (ii) the parties fail to reach a negotiated agreement.

52. Defendants' Counterclaims, however, do not identify any specific instances in which OGT failed to follow the agreed procedure, and the Counterclaims lack any factual allegations that would provide sufficient notice to OGT or the Court of the instances to which they vaguely refer.

53. While Defendants argue in briefing that an email chain attached to their Counterclaims reflects a situation in which 7D reduced OGT's number of hours of performance, (see Am. Countercls. Ex. 11, ECF No. 33.12), there are no factual, non-conclusory allegations (or exhibits) suggesting that OGT failed to follow the dispute resolution process in H.2 and H.7 with respect to that situation. Merely because OGT

had a *reason* to submit a claim to 7D under section H.2 does not mean that it was compelled to do so.

54. There are also no well-pleaded factual allegations suggesting that OGT's commencement of this action somehow failed to comply with the contractual provisions.

55. Considering the Counterclaims and their exhibits in the light most favorable to the non-movants, the Counterclaims fail to plead facts sufficient to state a claim for breach of contract as alleged in subparagraph 71(q). Thus, the motion to dismiss will be **GRANTED** as to this claim.

56. The movants also contend that, with respect to subparagraphs 71(b), (d), (f), (h), (l), and (m), Defendants have not pleaded sufficient facts to state a claim for breach.

57. North Carolina's notice-pleading standard, however, sets a "relatively low bar" to plead a breach of contract, *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *11 (N.C. Super. Ct. June 19, 2019): a pleading party need only provide sufficient information about its claim "to enable the adverse party to understand its nature and basis and to file a responsive pleading." *Pyco Supply Co. v. Am. Centennial Ins. Co.*, 321 N.C. 435, 442 (1988); *see also* N.C. R. Civ. P. 8(a)(1) (requiring a "short and plain statement of the claim"); N.C. R. Civ. P. 84 (providing sample complaints that "are intended to indicate the simplicity and brevity of statement which the rules contemplate" for notice pleading). Defendants have largely met that standard.

58.     Subparagraphs 71(b), (d), (f), and (h). As to subparagraphs 71(b), (d), (f), and (h), Defendants allege that OGT provided workers without appropriate security clearances, proof of insurance, or proof of physicals; failed to provide 7D notice when workers left an engagement or were substituted; failed to provide updated personnel rosters; provided workers whom the government ultimately required 7D to remove due to missing valid security clearances; and improperly billed for work, including for work provided by unqualified or non-credentialed workers. These actions allegedly amount to violations of sections B.2, B.6, C.1, G.3, and G.7 of the ARSOF Subcontract and sections 1.6.9, 1.6.12, 1.6.13, 1.6.14.1, 1.6.17.4, 1.6.17.6, and 1.6.22 of the PWS. The movants argue that the generalized contents of those four subparagraphs do not provide sufficient notice of the facts constituting each breach. (Am. Countercls. ¶ 71(b), (d), (f), (h)).

59.     Considering only the allegations in the Counterclaims, the movants would likely be correct. However, Defendants' exhibits provide details regarding the alleged breaches and are incorporated into the Counterclaims. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018) (noting that a court deciding a motion to dismiss should "consider any exhibits attached to the complaint because '[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.'" (alteration in original) (quoting N.C. R. Civ. P. 10(c))).

60.     For example, the exhibits attached to the Counterclaims include various notices to cure issued by 7D to OGT that, among other things,

a. identify individuals allegedly without proper medical or insurance information on file, (Ex. 24, Notice of 26 March 2024, ECF No. 33.25);

b. list changes in personnel that OGT purportedly made without notifying 7D, (Ex. 24, Notice of 29 March 2024 Regarding Unreported Changes, ECF No. 33.25);

c. provide notice that the government told 7D that certain OGT personnel lacked proper security clearances, (Ex. 24, Notice of 29 March 2024 Regarding Security Concern, ECF No. 33.25); and

d. provide notice that OGT failed to provide a required roster, (Ex. 24, Notice Regarding Monthly Subject Roster, ECF No. 33.25).

61. While Defendants' sparse allegations alone would be insufficient to state a claim, combined with the exhibits to the Counterclaims, Defendants have adequately identified and provided notice of the alleged breaches at issue and have sufficiently stated a claim for breach of contract. Accordingly, the Court will **DENY** the motion to dismiss as to the claims asserted in these subparagraphs.[3]

62. <u>Subparagraph 71(l)</u>. In subparagraph (l), Defendants allege that OGT failed "to provide 46% of the workshare (*i.e.*, actual work performed) under the agreement," thereby violating sections B.3, B.3.1, and B.3.2 of the ARSOF Subcontract. (Am.

---

[3] This is not to say, however, that the Counterclaims are well pleaded. The burden is on the pleading party to adequately plead its claims, and neither the Court nor the opposing party should be required to parse through hundreds of pages of documents slapped onto a complaint or counterclaims as exhibits without any substantive allegations or descriptions of allegations in the text of the pleading itself. Simply because the Court has a fishing license does not mean that counsel need to put it to the test. Rather, counsel are reminded that they should directly and concisely plead the facts they seek to have considered. N.C. R. Civ. P. 8(e)(1) ("Each averment of a pleading shall be simple, concise, and direct.").

Countercls. ¶ 71(l)). This allegation is simple, factual, and straightforward, states a claim on its face, and provides sufficient information for the movants to understand and respond to the allegation. The Court will **DENY** the motion to dismiss as to the claim raised by this subparagraph.

63. <u>Subparagraph 71(m)</u>. As to subparagraph 71(m), Defendants contend that OGT failed "to provide required equipment (*e.g.*, vans) for use by 7D personnel under the ARSOF Subcontract," thereby violating sections B.2 and C.1 of the ARSOF Subcontract and sections 1.1 and 4.1 of the PWS. (Am. Countercls. ¶ 71(m)).

64. Section B.2 of the ARSOF Subcontract requires OGT to provide "necessary documentation, licenses, and certifications required by position or equipment/item to successfully conduct work and activities," while section C.1 requires OGT to "furnish all . . . equipment, services, and materials necessary to provide the Supplies or furnish the services set forth in each issued Task Order," among other things. (ARSOF Subcontract §§ B.2, C.1). Sections 1.1 and 4.1 of the PWS contain requirements similar to that in section C.1 of the ARSOF Subcontract. (*See* PWS §§ 1.1, 4.1).

65. Between Defendants' reference to vans as the specific equipment not provided and the identification of the contract provisions at issue, Defendants have sufficiently pleaded a breach of contract claim and provided adequate information for OGT to respond appropriately. *See Pyco*, 321 N.C. at 442; *Vanguard*, 2019 NCBC LEXIS 39, at *11; *see also* N.C. R. Civ. P. 8(a)(1); *cf.* N.C. R. Civ. P. 84. Thus, the Court will **DENY** the motion to dismiss as to the claim raised by this subparagraph.

66. Subparagraph 71(r). Finally, the movants challenge subparagraph 71(r), which alleges that OGT violated the ARSOF Subcontract "[i]n other ways to be proven through discovery and at trial." This subparagraph is wholly generalized and fails to provide notice of what, if anything, Defendants contend (or might contend) to be a breach of the ARSOF Subcontract. The Court will therefore **GRANT** the motion to dismiss as to any purported claim raised by subparagraph 71(r) of the Counterclaims.

67. **Second Claim for Relief—Breach of the EOS Subcontract (7D v. OGT)**. OGT and Third-Party Defendants contend that the Court should dismiss 7D's claim against OGT for breach of the EOS Subcontract because 7D failed to plead sufficient facts to state a claim upon which relief can be granted. The Court agrees.

68. A party seeking relief for a breach of contract must allege enough of "the facts constituting the breach" to put the alleged wrongdoer on notice of the nature of the claim and allow it to respond. *Cantrell v. Woodhill Enters.*, 273 N.C. 490, 497 (1968). "[C]onclusory allegations of a breach will not do." *Barings LLC v. Fowler*, 2025 NCBC LEXIS 18, at *8 (N.C. Super. Ct. Feb. 13, 2025).

69. Here, 7D alleges that OGT violated various provisions of the EOS Subcontract by

> a. Failing to return all Government property when it departed the EOS training facility, which resulted in a Government cure notice being issued to 7D (e.g., violation of PWS 3.5);
> b. Failing to provide a sufficient number of instructors on staff multiple times (e.g., violation of Sections B.3, C.1, PWS 2.6-2.9);
> c. Failing to provide a sufficient number of role players for various exercises (e.g., violation of Sections B.3, C.1, PWS 2.10);

d. Submitting improper invoices for incorrect hours worked and billed (e.g., violation of Section B.6);

e. Providing at least one employee that the U.S. Air Force removed for inappropriate conduct on site (e.g., violation of Section G.7); and

f. In other ways to be proven through discovery and at trial.

(Am. Countercls. ¶ 80).

70. While Defendants need not plead their claim with particularity, their barebones allegations fail to meet applicable notice-pleading requirements. 7D fails to provide any non-conclusory, factual allegations (or exhibits) that provide notice of the alleged government property that was not returned, the occasions when OGT failed to provide a sufficient number of workers, the invoices that were allegedly incorrect, or the nature of the Air Force's removal of an employee.

71. As above, Defendants' allegation of breaches "[i]n other ways to be proven through discovery and at trial" is wholly generalized and fails to provide notice of any alleged breach.

72. Accordingly, the Court will **GRANT** the motion to dismiss the claim for breach of the EOS Subcontract.

73. **Third Claim for Relief—Declaratory Judgment (7D v. OGT)**. The movants also seek dismissal of two parts of 7D's declaratory judgment claim: (i) the request for a declaration that the language of section B.3.1 of the ARSOF Subcontract requiring OGT to "'identify a replacement' means that OGT must complete the replacement of a contractor" within the ten-day period, and (ii) the request for a determination that "7D is entitled to reduce the rates charged by OGT under the

ARSOF Subcontract commensurate with the Government's 15% reduction to the ARSOF Contract in 2025." (Am. Countercls. ¶ 88(a), (d)).

74. OGT argues that 7D has misinterpreted the ARSOF Subcontract. However, "[a] motion to dismiss for failure to state a claim is seldom appropriate 'in actions for declaratory judgments, and will not be allowed simply because the plaintiff may not be able to prevail.'" *Morris v. Plyler Paper Stock Co.*, 89 N.C. App. 555, 557 (1988) (quoting *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 439 (1974)). Instead, a motion to dismiss a declaratory judgment claim "is appropriate only 'when the complaint does not allege an actual, genuine existing controversy,'" *Bennett v. Bennett*, 2019 NCBC LEXIS 19, at *30–31 (N.C. Super. Ct. Mar. 15, 2019) (quoting *LegalZoom.com, Inc. v. N.C. State Bar*, 2012 NCBC LEXIS 49, at *9 (N.C. Super. Ct. Aug. 27, 2012)), or when the declaratory judgment claim is duplicative of another substantive claim that the court must already address, *e.g.*, *Augur v. Augur*, 356 N.C. 582, 588–89 (2002) ("[S]ection 1-257 permits a trial court, in the exercise of its discretion, to decline a request for declaratory relief when (1) the requested declaration will serve no useful purpose in clarifying or settling the legal relations at issue . . . ."); *Exencial Wealth Advisors, LLC v. Downing*, 2025 NCBC LEXIS 38, at *38 (N.C. Super. Ct. Apr. 1, 2025) ("However, a court may dismiss a claim for declaratory judgment as duplicative if all issues concern questions that the Court will have to resolve in addressing the parties' claims for breach of contract." (citation and internal punctuation omitted)); *see also Port City Logistics, Inc. v. Chasewater Logistics, LLC*, No. 3:23-CV-541-RJC-DCK, 2024 U.S. Dist. LEXIS 146366, at *14

(W.D.N.C. July 17, 2024) ("Many courts have previously recognized that a declaratory judgment does not serve a useful purpose where that purpose is only to resolve an already-existing breach of contract claim.").

75.  Thus, in evaluating a motion to dismiss a declaratory judgment claim, the question is not whether the plaintiff is entitled to a declaration favorable to the plaintiff "but whether he is entitled to a declaration of rights at all, so that even if the plaintiff is on the wrong side of the controversy, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory judgment." *Sanders v. State Pers. Comm'n*, 197 N.C. App. 314, 322 (2009) (quoting *Nationwide Mut. Ins. Co. v. Roberts*, 261 N.C. 285, 288 (1964)).

76.  Here, Defendants have pleaded facts that, taken as true and alone, reflect the existence of genuine controversies as to the requirements of section B.3.1 of the ARSOF Subcontract and whether 7D is entitled to reduce OGT's rates.

77.  Thus, as to the request for a declaratory judgment concerning the reduction of OGT's rates, Defendants have stated a claim that may proceed to further litigation.

78.  However, with respect to 7D's request for a declaration that the language of section B.3.1 of the ARSOF Subcontract requiring OGT to "'identify a replacement' means that OGT must complete the replacement of a contractor" within the ten-day period, Defendants have also raised—and the Court has dismissed—a corresponding and duplicative breach of contract claim. The declaratory judgment claim on this issue will "serve no useful purpose in clarifying or settling the legal relations at issue" since the Court has resolved the question by granting the motion to dismiss the

breach of contract claim. *Augur*, 356 N.C. at 588–89; *Exencial*, 2025 NCBC LEXIS 38, at \*38. The claim is therefore moot and should be dismissed as such.

79. Accordingly, the Court will **GRANT in part** the motion to dismiss as to the request for a declaratory judgment concerning the language of section B.3.1 of the ARSOF Subcontract, dismissing the claim without prejudice as moot, and **DENY in part** the motion as to the requested rate-reduction declaration.

80. **Fourth Claim for Relief—Tortious Interference with Prospective Business Relationships (7D v. OGT and Smith)**. While 7D initially asserted a purported claim for tortious interference with prospective business relationships against OGT and Smith, (Am. Countercls. ¶¶ 94–104), 7D voluntarily dismissed that claim without prejudice on 24 June 2025, (ECF No. 91).

81. Because 7D has voluntarily dismissed the claim, that portion of the motion to dismiss is moot. Accordingly, the Court will **DENY as moot** the motion to dismiss with respect to 7D's Fourth Claim for Relief for tortious interference with prospective business relationships.

82. **Fifth Claim for Relief—Tortious Interference with Contractual Relations (7D v. OGT and Smith)**. OGT and Smith also seek dismissal of 7D's alleged claim for tortious interference with contractual relations.

83. To state a claim for tortious interference with contract, a plaintiff must plead facts that establish the following elements: "(1) a valid contract between plaintiff and a third person that confers upon plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally

induces the third person not to perform the contract; (4) the defendant acts without justification; and (5) the defendant's conduct causes actual pecuniary harm to plaintiff." *Burgess v. Busby*, 142 N.C. App. 393, 403 (2001) (citing *United Lab'ys, Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988)).

84. Here, Defendants allege that 7D had a contract with the government and that OGT and Smith had knowledge of that contract. However, Defendants do not allege that the government failed to perform under the contract or that OGT or Smith induced the government to do so.

85. Defendants also contend only that OGT and Smith "complained" to the government about 7D's performance and "communicated with the Government to cause reputational harm to 7D in the eyes of the Government." (Am. Countercls. ¶¶ 105–09). Even as pleaded, this does not rise to the level of "actual pecuniary harm" to 7D. *See Burgess*, 142 N.C. App. at 404.

86. 7D has not stated a claim for tortious interference with contract, and the Court will **GRANT** the motion to dismiss this Fifth Claim for Relief.

87. **Sixth and Seventh Claims for Relief—Fraud, Fraudulent Inducement, and Negligent Misrepresentation (7D v. OGT, Gross, Haggerty, and Farr)**. The movants also move to dismiss 7D's alleged claims for fraud, fraudulent inducement, and negligent misrepresentation against each of them.

88. A plaintiff seeking to recover for fraud (whether framed as fraud, fraudulent inducement, or otherwise) must plead factual, non-conclusory allegations demonstrating the defendant's "(1) [f]alse representation or concealment of a material

fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138 (1974). "Additionally, any reliance on the allegedly false representations must be reasonable." *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9 (2018) (citation omitted). "A claim for fraud may be based on an affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction which the parties had a duty to disclose." *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696 (2009) (citation and quotation marks omitted).

89.    Where a litigant attempts to plead an "omission-based fraud claim," the pleading must particularly allege:

> (1) the relationship between plaintiff and defendant giving rise to the duty to speak; (2) the event that triggered the duty to speak or the general time period over which the relationship arose and the fraud occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what the defendant gained from withholding the information; (6) why the plaintiff's reliance on the omission was reasonable and detrimental; and (7) the damages the fraud caused the plaintiff.

*Tillery Env't LLC v. A&D Holdings, Inc.*, 2018 NCBC LEXIS 13, at *21–22 (N.C. Super. Ct. Feb. 9, 2018) (citation omitted).

90.    Similarly, to state a claim for negligent misrepresentation, a plaintiff must allege that he "justifiably relie[d] to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988); *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 33 (2003).

91. In each instance, "to establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 454 (2015) (citation and internal punctuation omitted).

92. Rule 9(b) of the North Carolina Rules of Civil Procedure requires plaintiffs to plead fraud with particularity. "[I]n pleading actual fraud[,] the particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 263 (2023) (alterations in original) (quoting *Terry v. Terry*, 302 N.C. 77, 85 (1981)). The same requirement applies to claims for negligent misrepresentation. *Id.* at 265–66.

93. As the primary basis for its fraud, fraudulent inducement, and negligent misrepresentation claims, 7D contends that (i) "Attwa told Clark that the Government would issue one task order per year for all of its ARSOF requirements and that 7D could bill the Government in 12 equal monthly installments for all work performed," (ii) nonetheless, the government also conducts monthly meetings with the prime contractor to "confirm the last month's execution and finalize the next month's execution" under the prime contract,[4] which Attwa did not tell 7D, and (iii)

---

[4] Defendants allege that "[u]nder the Statement of Objectives, the Government issues task orders that can be billed only as role players are used (cost reimbursable)," (Am. Countercls.

"Gross and Farr never corrected Attwa's misrepresentations"[5] even though they were present at the meeting. (Am. Countercls. ¶¶ 122–23; ECF No. 77 at 21–22).

94. As secondary arguments, Defendants allege that, at various times between January 2023 and May 2024, Attwa, Farr, Haggerty, and Gross told Clark (and thus 7D) that OGT wanted to be and would be a "good partner" or "good teammate" to 7D; that OGT "would fix" the work and revenue allocations under the ARSOF Subcontract; that OGT intended to help 7D resolve its issues under the ARSOF Subcontract; and that OGT wanted to "phase-out its work on ARSOF" and would provide a transition plan. (Am. Countercls. ¶¶ 127–35).

95. OGT and Third-Party Defendants argue primarily that Defendants failed to plead these causes of action with the requisite particularity to state a claim, that no duty of care was owed to 7D, and that 7D has failed to plead facts demonstrating that any alleged reliance was justifiable or reasonable. (*See* ECF No. 36 at 20–26).

96. <u>Allegations Regarding Government's Procedures and Performance Under the ARSOF Contract</u>. As to Defendants' contentions that Attwa (and, thus, OGT) inaccurately described the government's task order and invoice-related processes and

---

¶ 125), though there are no apparent factual, non-conclusory allegations about the frequency of such role-player invoicing. Even construing all inferences in favor of Defendants as the non-movants, it is at best unclear whether Defendants are attempting to allege that this is inconsistent with Attwa's alleged representations since Defendants do not specify the frequency of role-player usage, including whether it is less frequent than monthly. In either case, the Court's analysis of the fraud, fraudulent inducement, and negligent misrepresentation claims is the same, and the result would be the same.

[5] Though Defendants argue in their briefing that Gross and Farr did not "correct" Attwa's statements (or, more accurately, *supplement* the alleged statements), the Counterclaims lack any factual allegations regarding Farr's or Gross's conduct beyond merely attending the meeting at issue.

procedures under 7D's prime ARSOF Contract with the government, the Court concludes that Defendants have failed to plead an actionable claim for fraud, fraudulent inducement, or negligent misrepresentation.

97. Initially, Defendants plead the circumstances surrounding Attwa's alleged misrepresentations or omissions with the requisite particularity, *Tillery*, 2018 NCBC LEXIS 13, at *21–22, and even OGT and Third-Party Defendants acknowledge that the allegations are pleaded with some "specificity." (ECF No. 36 at 23; *see also* ECF No. 81 at 12; Am. Countercls. ¶¶ 122–26).

98. Considering the substantive allegations of the Counterclaims, OGT and Third-Party Defendants contend that OGT owed no duty to 7D to explain the ARSOF Contract, which is between 7D and the government.

99. Ordinarily, this would be true. Based on the allegations of the Counterclaims, OGT and 7D were sophisticated parties contracting at arm's length, and there are no facts pleaded to suggest that OGT was under an affirmative duty to disclose information to 7D regarding 7D's contract with the government. *E.g.*, *B & F Slosman v. Sonopress, Inc.*, 148 N.C. App. 81, 87 (2001) (no duty to disclose in transaction between "sophisticated businessmen" who were experienced in such transactions); *RREF BB Acquisitions, LLC v. MAS Props., L.L.C.*, 2015 NCBC LEXIS 61, at *28 (N.C. Super. Ct. June 9, 2015) ("Typically, commercial parties in arms-length negotiations with one another do not have a duty to disclose." (citations omitted)).

100. But several exceptions to this rule exist:

> The first is when one party takes an affirmative step to conceal a material fact from the other. A concealed fact is considered material when it would have influenced the decision or judgment of another party, if known. The second is when "one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." In addition to these situations, even when no duty to disclose exists, a party who chooses to speak has a duty to make a full and fair disclosure of facts concerning the matters on which he chooses to speak.

*Tillery*, 2018 NCBC LEXIS 13, at *22 (citations omitted).

101. Here, Defendants allege that OGT, through Attwa, *voluntarily* undertook to disclose information about the government's processes and procedures under the ARSOF Contract. (Am. Countercls. ¶ 122). The Court concludes that Defendants have adequately pleaded that OGT owed a duty of care to 7D to ensure that its statements through Attwa were accurate and otherwise to make a full and fair disclosure of the information known to OGT about the nature of task-order placement and billing under 7D's contract with the government. *See Tillery*, 2018 NCBC LEXIS 13, at *22.

102. Because Attwa's alleged statements and related omissions could give rise to a duty of care, the Court analyzes whether Attwa's conduct otherwise meets the requirements for a fraud, fraudulent inducement, or negligent misrepresentation claim.

103. OGT and Third-Party Defendants contend that Defendants have not adequately pleaded reasonable or justifiable reliance by 7D, and the Court agrees.

104. Generally, to establish justifiable or reasonable reliance, "a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he was denied the opportunity to investigate or that he could not have

learned the true facts by exercise of reasonable diligence." *Arnesen*, 368 N.C. at 454 (citation and internal punctuation omitted).

105. As OGT and Third-Party Defendants have detailed, 7D has not alleged that it made any sort of inquiry into the subject matter of Attwa's purported misrepresentations or omissions, that it was denied the opportunity to investigate, or that it could not have learned the truth about the government's invoice-related practices or the ARSOF Contract through reasonable diligence. Though Defendants make the conclusory allegation that 7D "could not have learned the truth for itself," (Am. Countercls. ¶ 137), Defendants fail to support this conclusion with any factual allegations.

106. While certain exceptions exist to the rule requiring investigation or denial of the opportunity to investigate as a prerequisite to demonstrating justifiable reliance,[6] the facts giving rise to those exceptions do not exist here, despite Defendants' arguments to the contrary. There are no non-conclusory, factual allegations suggesting that the parties were not on equal footing with respect to execution of the ARSOF Subcontract.

107. Though 7D alleges that OGT had superior "knowledge of the requirements and potential profitability and liabilities of the ARSOF project" "[d]ue to OGT serving as the prime contractor for several years," (Am. Countercls. ¶ 111), 7D was awarded

---

[6] *E.g.*, *Shaver v. Walker*, 2023 NCBC LEXIS 51, at *17 (N.C. Super. Ct. Mar. 31, 2023) (explaining that, when "the parties are not on equal footing, and a defendant possessing superior knowledge and/or experience makes a representation without giving the plaintiff reason to suspect the representation is false, the plaintiff may rely upon that representation" (citation omitted)).

and finalized the ARSOF Contract (and its relationship with the government) *before* it signed the ARSOF Subcontract with OGT. (*See, e.g.*, ARSOF Subcontract at 1 (Cover Page) (referring prominently to "Prime Contract Number: H92239-23R-XXXX"); ARSOF Subcontract § A, Recitals at 3 ("WHEREAS Seventh Dimension *has been awarded prime contract number H92239-23R-XXXX* (the 'Prime Contract') by U.S. Army Special Operations Command (USASOC) (USASOC, the 'Customer' or 'Government')" and "WHEREAS, Prime Contract *was* solicited and *awarded*" (emphasis added))).

108. 7D even made express statements in the ARSOF Subcontract regarding its review and understanding of the terms of the ARSOF Contract, including the requirements as to the performance that would be required under the ARSOF Contract. (*See, e.g.*, ARSOF Subcontract § A, Recitals at 3 ("WHEREAS, Subcontractor has certain capabilities, experience and expertise that *are required* by Seventh Dimension *to perform the Prime Contract*" (emphasis added))). Other provisions of the ARSOF Subcontract and PWS specifically discuss the annual Statement of Objectives, as well as monthly reviews of 7D's performance. (*See, e.g.*, ARSOF Subcontract §§ B.3.3.2, B.3.3.3, B.3.3.4.1, B.3.3.4.2, B.3.3.5.1, B.3.3.5.2, B.3.3.6.1, B.3.3.6.2, B.3.3.7.1, B.3.3.7.2; PWS §§ G, 1.6.19).

109. Necessarily then, 7D knew—or should have known—the terms of the ARSOF Contract (i.e., the Prime Contract) and the details of its relationship with the government when 7D signed the ARSOF Subcontract and indicated therein that OGT

possessed the abilities "required . . . to perform the Prime Contract." (ARSOF Subcontract § A, Recitals at 3).

110. Defendants have pleaded no facts that would suggest there was a fiduciary or other relationship of trust and confidence between OGT and 7D that might otherwise relieve 7D of the obligation to conduct its own independent investigation. *See, e.g.*, *Harding v. S. Loan & Ins. Co.*, 218 N.C. 129, 135 (1940) ("It is generally held that one has no right to rely on representations as to the condition, quality or character of property, or its adaptability to certain uses, where the parties stand on an equal footing and have equal means of knowing the truth." (citation omitted)); *cf. Wilson v. Pershing, LLC*, 253 N.C. App. 643, 655 (2017) (noting, in the context of a statute of limitations argument concerning a fraud claim, that "a plaintiff cannot simply ignore facts which should be obvious to him *or* would be *readily discoverable upon reasonable inquiry*" (citation omitted)).

111. In short, Defendants "did not allege enough facts to show that [7D] made an independent inquiry or investigation or that [7D] was denied the opportunity to do so. Because [7D] did not satisfy this element," the claims of fraud, fraudulent inducement, and negligent misrepresentation "must fail." *Spitzer-Tremblay v. Wells Fargo Bank, N.A.*, No. COA16-334, 250 N.C. App. 508, 2016 N.C. App. LEXIS 1127, at *8 (Nov. 15, 2016) (unpublished) (affirming dismissal of fraud and negligent misrepresentation claims).

112. Further, under the specific circumstances of this case, 7D's alleged reliance upon Attwa's statements in entering into the ARSOF Subcontract was neither

reasonable nor justified as a matter of law. In short, 7D cannot reasonably claim that it signed a contract (or otherwise entered into a contractual relationship with the government) requiring it to comply with certain processes and procedures yet assert at the same time that it failed to inquire about the terms of that contractual relationship and instead relied on purported representations made on behalf of OGT—a non-party to the 7D-government relationship. The claims also fail on this basis. *See Sullivan*, 158 N.C. App. at 26 ("Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." (citation omitted)); *DC Custom Freight, LLC v. Tammy A. Ross & Assocs., Inc.*, 273 N.C. App. 220, 233 (2020) (same).

113. Finally, inasmuch as Attwa's statements (as opposed to omissions) were forward-looking statements concerning what the government "would" do or "could" do, (Am. Countercls. ¶¶ 122–23, 125), the representations concerned future prospects rather than existing facts and are not actionable. *Ragsdale*, 286 N.C. at 139 (noting that fraud requires a "subsisting or ascertainable fact, as distinguished from a matter of opinion or representation relating to future prospects"); (*see also* Am. Countercls. ¶ 122).

114. Thus, the claims concerning Attwa's alleged misrepresentations and omissions to 7D on behalf of OGT are appropriately **DISMISSED**.

115. <u>Allegations of Good Partner/Good Teammate and Similar Statements</u>. The Court next addresses Defendants' contentions that OGT and Third-Party Defendants misrepresented that OGT intended to be a "good partner" or "good teammate" with

7D and made various other similar or related statements, largely after execution of the ARSOF Subcontract, as a result of which 7D seeks to hold OGT and the Third-Party Defendants (in their individual capacities) liable. (Am. Countercls. ¶¶ 128, 130, 135).

116. First, Defendants fail to plead non-conclusory factual allegations suggesting that these statements were actually untrue. Though Defendants make the general assertion that "OGT, Gross, Haggerty, and Farr made these misrepresentations and omissions with the intent to deceive 7D," (Am. Countercls. ¶ 136), none of the facts pleaded suggest that OGT or any Third-Party Defendant did *not* intend to be a "good teammate," or "good partner," or otherwise to cooperate with Defendants, nor are facts pleaded to suggest that the statements were otherwise inaccurate or prepared without reasonable care. Defendants' conclusory statement that they were "misrepresentations" is not supported by the factual allegations of the Counterclaims. *See Ragsdale*, 286 N.C. at 138 (noting that the first element of a fraud claim is a "[f]alse representation or concealment of a material fact"); *Sullivan*, 158 N.C. App. at 33 (noting that negligent misrepresentation requires a showing that the claimant relied "on information prepared without reasonable care").

117. Second, for largely the same reasons, these statements are not actionable as fraud or as a negligent misrepresentation. Instead, they are, at most, promises or statements of intent. *See Trana Discovery, Inc. v. S. Rsch. Inst.*, 915 F.3d 249, 254 (4th Cir. 2019) ("A promise is a statement of intention, not fact, meaning it is false only if the promisor never honestly intended to carry it out. It can be intentionally

false, but not negligently so." (citations omitted)); *Hills Mach. Co. v. Pea Creek Mine, LLC*, 265 N.C. App. 408, 420 (2019) ("The general rule is that an unfulfilled promise cannot be the basis for an action for fraud unless the promise is made with no intention to carry it out." (quoting *Nw. Bank v. Rash*, 74 N.C. App. 101, 105 (1985))).

118.  To prevail on a claim for fraud based on a false promise, the plaintiff must allege facts indicating that, at the time of making the promise, the promisor had no intention to carry it out. *See Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 229 (2015). Nonperformance alone cannot establish a lack of intent. *Williams v. Williams*, 220 N.C. 806, 811 (1942). At the pleading stage, "the plaintiff must allege facts from which a court and jury may reasonably infer that the defendant did not intend to carry out such representations when they were made." *Martin Commc'ns, LLC v. Flowers*, 2021 NCBC LEXIS 30, at *13 (N.C. Super. Ct. Mar. 31, 2021) (citation and internal punctuation omitted).

119. Defendants allege only that Gross, Haggerty, and Farr made various promises of future performance on OGT's behalf, many of them generic; they have not made any non-conclusory factual allegations indicating that OGT or its individual agents lacked the intent to perform at the time they made those statements. *See Johnson v. Owens*, 263 N.C. 754, 756 (1965) (noting that a statement must be "definite and specific" to support a claim for fraud).

120.  Thus, the fraud, fraudulent inducement, and negligent misrepresentation claims fail to the extent they are based on alleged misrepresentations made after the parties entered into the ARSOF Subcontract.

121. <u>Liability of Individual Third-Party Defendants</u>. The Court next addresses the alleged individual liability of the individual Third-Party Defendants.

122. When seeking to hold a company's directors, officers, or agents liable, a plaintiff must "allege sufficient facts of individual participation in any wrongdoing." *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 57 (2001). For a fraud or fraudulent inducement claim, this means alleging either participation in the making of the fraudulent statements or that the defendant failed to speak despite having a duty to do so. *See id.*

123. As addressed briefly above, our courts have recognized the existence of a duty to disclose where "(1) a fiduciary relationship exists between the parties to the transaction; (2) there is no fiduciary relationship and a party has taken affirmative steps to conceal material facts from the other; and (3) there is no fiduciary relationship and one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." *Hardin*, 199 N.C. App. at 696 (citation and internal punctuation omitted). In addition, and as also mentioned above, "a party who chooses to speak has a duty to make a full and fair disclosure of facts concerning the matters on which he chooses to speak." *Tillery*, 2018 NCBC LEXIS 13, at *22.

124. As for negligent misrepresentation, the agent, officer, or director must have owed the plaintiff a duty of care and participated in the making of a false representation to the plaintiff. *See Raritan*, 322 N.C. at 206. "[U]nder North Carolina law, a negligent misrepresentation claim cannot be based on an omission." *B&D*

*Software Holdings, LLC v. Infobelt, Inc.*, 2024 NCBC LEXIS 103, at *35 (N.C. Super. Ct. Aug. 1, 2024) (alteration in original) (citation omitted).

125. Here, for the same reasons that the fraud, fraudulent inducement, and negligent misrepresentation claims fail against OGT, they also fail against the Third-Party Defendants who allegedly made or failed to correct them. *See, e.g.*, *Sullivan*, 158 N.C. App. at 26 (addressing requirements for reasonable or justifiable reliance); *Supplee*, 239 N.C. App. at 229 (explaining that a promise is not actionable as fraud unless the plaintiff demonstrates that when the promisor made the promise, he did not intend to carry it out).

126. Moreover, other than the conclusory assertions regarding being a "good teammate" or "good partner" or similar generalized statements, Defendants do not allege that Gross, Haggerty, or Farr made any specific misrepresentations or undertook to explain anything to 7D. Defendants also do not contend—nor do the allegations indicate—that these three OGT officers owed 7D a fiduciary duty, took affirmative steps to conceal material facts, or had knowledge of a latent defect. Defendants have mostly asserted generalized allegations against Gross, Haggerty, and Farr, (*see, e.g.*, Am. Countercls. ¶¶ 116, 121, 143–44), plus allegations that Gross and Farr met with Clark in OGT's Raleigh office during the same meeting that saw Attwa make his alleged misrepresentations,[7] (Am. Countercls. ¶ 122).

---

[7] While Defendants allege that Attwa made misrepresentations regarding the substance of the ARSOF Contract or 7D's relationship with the government, Attwa is not a named party to this action.

127. These allegations do not indicate individual participation by Gross, Haggerty, or Farr in Attwa's alleged misrepresentations or any other misrepresentations made before 7D and OGT agreed to the ARSOF Subcontract. There are simply no facts alleged to support such claims against the named individuals in their individual capacities.

128. For all these reasons, the Court will dismiss 7D's fraud, fraudulent inducement, and negligent misrepresentation claims in their entirety.

129. **Ninth Claim for Relief—N.C. Gen. Stat. § 75-1.1 *et seq*. (7D and Clark v. OGT, Gross, Haggerty, and Farr)**. Defendants broadly contend that OGT, Gross, Haggerty, and Farr engaged in unfair or deceptive acts or practices in or affecting commerce in violation of N.C. Gen. Stat. § 75-1.1 *et seq*. (colloquially, a "UDTP" or "unfair or deceptive trade practices" claim) by (i) "making misrepresentations and false statements" (i.e., those addressed above with respect to the fraud, fraudulent inducement, and negligent misrepresentation claims), (ii) "engaging in a calculated course of action to gain an unfair advantage when competing for the award of future Government contracts," (iii) "engaging in behaviors that were calculated to cause financial harm," (iv) "making false promises and taking actions to induce 7D and Clark to provide unearned and extra-contractual benefits," and (v) "demanding concessions from 7D related to the ARSOF Subcontract by threatening to withhold critical services related to military training." (Am. Countercls. ¶ 158(a)–(e)).

130. To state a UDTP claim, a plaintiff must allege that the "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656 (2001). "A practice is . . . deceptive if it has a tendency to deceive." *Id.* "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 302 N.C. 539, 548 (1981). "The determination of whether an act or practice is an unfair or deceptive practice that violates N.C.G.S. § 75-1.1 is a question of law for the court." *Krawiec*, 370 N.C. at 612–13 (citation omitted).

131. OGT and Third-Party Defendants first argue that Defendants have failed to plead fraud, fraudulent inducement, or negligent misrepresentation and that their UDTP claim thus fails to the extent it relies on allegations of fraud or negligent misrepresentation. This is correct. Where a UDTP claim is premised on an underlying cause of action, whether for fraud or otherwise, the claim necessarily fails when the underlying claim fails. *See, e.g.*, *Charah, LLC v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 52, at *19 (N.C. Super. Ct. Apr. 17, 2020) ("[W]hen the UDTP claim rests solely upon other claims, such as a claim for tortious interference with contract, which the court determines should be dismissed, the UDTP claim must fail as well."); *Crescent Foods, Inc. v. Evason Pharmacies, Inc.*, 2016 NCBC LEXIS 76, at *27–28 (N.C. Super. Ct. Oct. 5, 2016) (dismissing UDTP claim to the extent it relied on conduct underlying dismissed claims for fraud and breach of fiduciary duty). Defendants' UDTP claim

against OGT and all Third-Party Defendants thus fails to the extent it is premised upon alleged fraud, fraudulent inducement, or negligent misrepresentation.

132. Further, as explained above, Defendants have failed to sufficiently allege that Gross, Haggerty, or Farr participated in any actionable instance of fraud, fraudulent inducement, or negligent misrepresentation. OGT and Third-Party Defendants contend that the same is true regarding Defendants' claim that Gross, Haggerty, and Farr engaged in unfair or deceptive trade practices. The Court agrees in part.

133. Other than the non-actionable allegations addressed above, the Counterclaims assert no specific allegations of wrongdoing against Gross or Haggerty. Defendants point to Gross's alleged acknowledgment that the terms of the ARSOF Subcontract were unfair to 7D, (*see, e.g.*, Am. Countercls. ¶ 33), but that neither amounts to an unfair or deceptive practice in itself nor transmutes their generalized allegations into specific allegations of individual wrongdoing, (*see, e.g.*, Am. Countercls. ¶¶ 31, 113–16). The Court will dismiss this claim as to Gross and Haggerty.

134. Defendants do, however, allege certain facts suggesting that Farr defamed Clark. (Am. Countercls. ¶¶ 147–54). In their briefing, OGT and Third-Party Defendants only mention this claim to concede that it is properly pleaded. (*See* ECF No. 36 at 26 n.8, 27). Because a valid claim for defamation can support a claim for unfair or deceptive trade practices, *see, e.g.*, *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 35–36 (2002), and because the movants offer no argument regarding the

defamation allegations and do not seek to have that claim dismissed, the Court declines to dismiss the UDTP claim as to Farr based on his alleged defamation of Clark at this stage of the case.

135. Finally, Defendants' UDTP allegations in the Counterclaims (and arguments in the briefing) are broad and conclusory, providing little in the way of support for this alleged claim except as to the alleged defamation by Farr. To the extent that Defendants contend other bases (beyond fraud, fraudulent inducement, negligent misrepresentation, or defamation) exist for this claim, the Counterclaims fail to plead sufficient facts to provide notice of the underlying facts or otherwise to adequately allege a UDTP claim. *See Dalton*, 353 N.C. at 656; *Marshall*, 302 N.C. at 548; *Krawiec*, 370 N.C. at 612–13.

136. Among other things, Defendants have failed to plead non-conclusory facts demonstrating that OGT or the Third-Party Defendants have committed an unfair or deceptive act or practice or that any such acts caused injury to Defendants. *Dalton*, 353 N.C. at 656 (elements of UDTP claim).[8]

137. Thus, except as denied in this limited respect as to Farr, the motion to dismiss Defendants' UDTP claim will be **GRANTED** in its entirety.

138. **Tenth Claim for Relief—Punitive Damages (7D and Clark v. OGT, Gross, Haggerty, and Farr)**. OGT and Third-Party Defendants seek dismissal of the punitive damages claim as to OGT, Gross, and Haggerty (but not Farr), (Am.

---

[8] Again, this is without addressing the defamation claim against Farr.

Countercls. ¶¶ 167–69), arguing that 7D and Clark have stated no claim against them that would entitle Defendants to punitive damages.

139. Inasmuch as 7D and Clark assert a purported "claim" for punitive damages, however, the "claim" inherently fails as a matter of law because, as this Court and others have repeatedly recognized, "[p]unitive damages are available, not as an individual cause of action, but as incidental damages to a cause of action." *Collier v. Bryant*, 216 N.C. App. 419, 434 (2011) (citation omitted); *Hawkins v. Hawkins*, 101 N.C. App. 529, 532 (1991) ("As a general rule, '[p]unitive damages do not and cannot exist as an independent cause of action, but are mere incidents of the cause of action and can never constitute a basis for it.'" (alteration in original) (citation omitted)); *Greentouch USA, Inc. v. Lowe's Cos.*, 2024 NCBC LEXIS 132, at *27 (N.C. Super. Ct. Oct. 2, 2024) ("North Carolina courts have repeatedly held that a claim for punitive damages is not a stand-alone claim." (citation and internal punctuation omitted)).

140. Thus, this purported "claim" is appropriately dismissed *ex mero motu*, without prejudice to Defendants' ability to seek punitive damages as a remedy at a later stage of this action. *See Tuwamo v. Tuwamo*, 248 N.C. App. 441, 445 (2016) ("This Court has found that '[c]ourts have continuing power to supervise their jurisdiction over the subject matter before them, including the power to dismiss *ex mero motu*.'" (alteration in original) (quoting *Narron v. Union Camp Corp.*, 81 N.C. App. 263, 267 (1986))); *Maola Ice Cream Co. of N.C., Inc. v. Maola Milk & Ice Cream Co.*, 238 N.C. 317, 324 (1953) ("If the cause of action, as stated by the plaintiff, is inherently bad, why permit him to proceed further in the case, for if he proves

everything that he alleges he must eventually fail in the action." (citations omitted)).

## IV. CONCLUSION

141. Therefore, in its discretion where applicable, the Court hereby **GRANTS in part** and **DENIES in part** Plaintiff's and Third-Party Defendants' motion to dismiss as follows:

a. The Court **GRANTS** the motion as to the alleged breaches of contract asserted in subparagraphs 71(k), (p), (q), and (r) of the Counterclaims and **DISMISSES** with prejudice the alleged claim for breach of the ARSOF Subcontract to the extent it relies on those allegations;[9]

b. The Court **GRANTS** the motion as to the purported claim for breach of the EOS Subcontract and **DISMISSES** it with prejudice;

c. The Court **GRANTS in part** the motion as to the request for a declaratory judgment concerning the language of section B.3.1 of the ARSOF Subcontract and **DISMISSES** without prejudice as moot that part of the claim, and **DENIES in part** the motion as to the requested rate-reduction declaration;

d. The Court **DENIES as moot** the motion as to 7D's purported claim for tortious interference with prospective business relationships, as it was previously voluntarily **DISMISSED** without prejudice;

---

[9] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court . . . ." *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013). With respect to each of the claims addressed by this Order, the Court has carefully considered whether dismissal with or without prejudice is appropriate. In the exercise of its discretion, the Court has determined that certain claims should be dismissed without prejudice and the remaining claims should be dismissed with prejudice as indicated.

e. The Court **GRANTS** the motion as to 7D's purported claim for tortious interference with contractual relations and **DISMISSES** it with prejudice;

f. The Court **GRANTS** the motion as to the purported claims for fraud, fraudulent inducement, and negligent misrepresentation and **DISMISSES** them with prejudice;

g. The Court **GRANTS** the motion as to the purported Chapter 75/UDTP claim in all respects except to the extent asserted against Farr for alleged defamation, and, except as to that portion of the claim, the Chapter 75/UDTP claim is **DISMISSED** with prejudice;

h. The Court **GRANTS** the motion as to the purported punitive damages claim and **DISMISSES** it without prejudice to Defendants' ability to seek punitive damages as a remedy, if appropriate; and

i. The Court **DENIES** the motion in all other respects.

**SO ORDERED**, this 22nd day of August 2025.

/s/ Matthew T. Houston

Matthew T. Houston
Special Superior Court Judge
  for Complex Business Cases